Modestina Cercone v. Commissioner. Estate of Julius Cercone, Deceased, Modestina Cercone, Administratrix v. Commissioner.
Cercone v. Commissioner
Docket Nos. 90567, 90568.
United States Tax Court
T.C. Memo 1964-166; 1964 Tax Ct. Memo LEXIS 169; 23 T.C.M. (CCH) 969; T.C.M. (RIA) 64166; June 18, 1964
H. L. Libby, Stambaugh Bldg., Youngstown, Ohio, for the petitioners. John P. Graham, for the respondent. SCOTT Memorandum Findings of Fact and Opinion SCOTT, Judge: Respondent determined deficiencies in income tax and additions to tax of Modestina Cercone and Estate of Julius Cercone, Deceased, Modestina Cercone, Administratrix, for the years and in the amounts as follows: Modestina
Additions to Tax
Cercone.
Sec. 6653(b),
Sec.
Sec. 6654
294(d)(1)(A),
Year
Tax
Deficiency
1954 Code
1939 Code
1954 Code
1954
Income
$ 5,641.63
$ 2,820.82
$ 521.73
1955
Income
2,162.06
1,081.03
$ 56.76
1956
Income
2,998.69
1,499.35
78.71
1957
Income
2,833.36
1,416.68
74.38
$13,635.74
$ 6,817.88
$ 521.73
$209.85
*170 Estate of Julius Cercone, Deceased Modestina Cercone, Administratrix Additions to Tax
Sec. 293(b),
Sec. 294(d)(2),
Sec. 294(d)(1)(A),
Year
Tax
Deficiency
1939 Code
1939 Code
1939 Code
1951
Income
$ 556.00
$ 278.00
$ 30.36
1952
Income
2,961.95
1,480.98
169.86
1953
Income
3,818.23
1,909.11
241.70
Sec. 6653(b),
1954 Code
1954
Income
3,111.58
1,555.79
313.02
1955
Income
2,878.97
1,439.49
1956
Income
1,037.81
518.91
$14,364.54
$ 7,182.28
$ 441.92
313.02 The issues for decision are: (1) Whether there are deficiencies in the income tax of the Estate of Julius Cercone, Deceased, Modestina Cercone, Administratrix, for the years 1951, 1952, 1953, 1954, 1955 and 1956 and of Modestina Cercone for the years 1954, 1955, 1956 and 1957, (2) If there are deficiencies in such tax of the Estate of Julius Cercone, whether assessment and collection thereof for the years 1951, 1952 and 1953 is barred by the statute of limitations which is applicable absent proof that Julius Cercone for each of these years filed false and fraudulent income tax returns with intent to evade tax or for the years 1952 *171 and 1953 omitted from his returns more than 25 percent of his gross income; and (3) Whether any part of the deficiencies or underpayment in income tax, if any, of the Estate of Julius Cercone for each of the years 1951 through 1956 and of Modestina Cercone for the years 1954 through 1957 is due to fraud with intent to evade tax. Findings of Fact Julius Cercone (hereinafter referred to as Julius) was born June 15, 1917 in Italy. He came to this country with his parents Modestina and Ralph Cercone about 1925. He died on February 15, 1957. Julius was unmarried and resided with his mother Modestina Cercone at 700 Poland Avenue, Youngstown, Ohio until his death. His returns for the years 1951 through 1955 and the return of his estate for 1956 were filed on a calendar year basis with the district director at Cleveland, Ohio. The Estate of Julius Cercone was probated in Mahoning County, Ohio, and Julius' mother Modestina Cercone (hereinafter referred to as Modestina) was appointed Administratrix on February 27, 1957, and thereafter has served as administratrix. Julius' income producing activities included the ownership of various rental properties which are listed below, the operation *172 of a retail grocery store known as McAllister Dairy Store at 514 Gibson Street, Youngstown, Ohio, and operation of an electric welding and car repair business in a garage behind 700 Poland Avenue (lot 2552-Poland), where Julius and Modestina lived. Julius purchased and improved real estate in Youngstown, Ohio, at the location and in the years and at the cost as follows: Location
Date Purchased
Cost
Land
Buildings
Lot No. 2551 (Poland Ave.)
7/23/43
$ 1,000.00
Lot No. 3379 (Hayes Ave.)
1/22/45
400.00
(Hayes Ave.)
1/22/45
$ 5,513.00
Improvements Hayes Ave.
1/ 1/52
6,900.00
Lot No. 3379 (Erie)
1/22/45
300.00
Lot No. 3379 (Erie)
1/22/45
2,387.00
Lot No. 31190 (Wolf St.)
5/15/51
375.00
Lot No. 6861 (Glenwood)
6/20/51
810.00
1,690.00
Lot No. 3815 (Poland)
8/28/51
490.00
1,885.00
Lot No. 52810 (Rosewood)
11/21/51
590.00
Lot No. 52798 (Stocker)
11/21/51
295.00
1,240.00
Lot No. 31979 (Florida)
12/26/51
1,040.00
4,960.00
Improvements
220.00
Lot No. 52777 (Stocker)
12/ 4/51
235.00
Lot No. 28219 (Garland)
6/ 2/52
700.00
2,825.00
Lot No. 3633 (Gibson)
8/19/52
1,500.00
4/ 1/53
10,500.00
Lot No. 23544 (Indianola)
4/17/53
2,050.00
22,950.00
Improvements
1/20/55
550.00
Lot No. 4375 (Franklin)
2/ 2/54
275.00
Lot No. 5855 (Poland)
7/30/55
485.00
1,415.00
1,625.00
Lot No. 4376 (Franklin)
9/ 3/55
185.00
2,315.00
Lot No. 2961 (Ridge)
10/ 6/55
1,050.00
2,850.00
Lot No. 2962 (Ridge)
10/ 6/55
1,050.00
5,050.00
Lot No. 4260 (Arlington)
5/ 4/56
740.00
1,010.00
Lot No. 732 (Blaine)
2/13/57
1,176.00
28,824.00
*173 All of the above listed real estate was held by Julius until his death except two parcels. One of these two parcels sold by Julius was lot No. 52810, a vacant lot on Rosewood Avenue, with a cost basis to Julius of $590 which was sold by him on June 13, 1956, for $1,000. The other parcel sold by Julius was a part of lot No. 3379 on Hayes Avenue (643 Hayes Avenue) with a cost basis for the land of $400, for the apartments of $5,513, and for improvements of $6,900, all of which was sold by Julius to the Salvation Army on January 16, 1953, for $20,000. Depreciation allowed Julius on this property from the date of purchase to the date of sale amounted to $1,530.12. The remaining part of Lot No. 3379 on Hayes Avenue not sold by Julius contained two frame houses fronting on Erie Street and is hereafter referred to as lot 3379-Erie. Rental units owned by Julius as of the end of each year from 1951 through 1956, were as follows: 1951
1952
1953
1954
1955
1956
6 apartment
6 apartment
6 apartment
6 apartment
6 apartment
6 apartment
units
units
units
units
units
units
5 single
5 single
5 single
5 single
8 single
8 single
houses
houses
houses
houses
houses
houses
1 double
1 double
1 double
1 double
2 double
3 double
house
house
house
house
houses
houses
1 flat and
1 flat and
1 flat and
2 flats and
2 flats and
store
store
store
stores
stores
5 garages
5 garages
*174 The 1951 tax return of Julius was filed March 17, 1952. It shows a net loss of $490.06 for the year with no tax due. The return shows gross receipts from a trucking business in the amount of $4,808.02, expenses of $6,181.46, resulting in a net loss of $1,373.44. The return also shows net rental income of $868.38 from a "Frame Apart.", reflecting gross rents of $2,016, depreciation of $256.07, based on a straight-line 30-year-life and a cost of $7,700, and other rental expenses of $890.95. The same return reflects $15 income from "odd jobwelding." Julius' 1951 income tax return was filled out by Internal Revenue Agent Polas in the course of his duties while assisting taxpayers in filling out their 1951 tax returns. Polas' procedure in assisting taxpayers in filling out their returns was always to ask each of them: "Do you have any other income that was not reported?" Polas filled out Julius' 1951 return from the information supplied him by Julius. The 1952 tax return of Julius was filed March 13, 1953. It shows a net loss of $625.72 with no tax due. It shows a loss from the trucking business in the amount of $1,497.93, resulting from gross receipts of $1,411.20 and expenses of *175 $2,909.13. It shows net rental income of $872.21 from "Frame Apartment-643 Hayes Ave.", reflecting gross rental receipts of $2,280, depreciation on the building of $256.67 based on a straight-line 30-year life and a cost of $7,700, depreciation on improvements of $345, and other rental expenses of $806.12. The improvements for which depreciation was taken are a heating unit, new siding, and storm windows, all acquired on January 1, 1952, at a total cost of $6,900, and all having a claimed useful life of 20 years. Julius' 1952 income tax return was prepared by Internal Revenue Agent Cappelli in the course of his duties of assisting taxpayers in filling out their 1952 income tax returns. Cappelli filled out Julius' 1952 return from oral information supplied him by Julius, together with the retained copy of the 1951 return. The cost basis to Julius of the apartment house at 643 Hayes Avenue without the improvements in 1952 was $5,513. The 1953 tax return of Julius was filed March 16, 1954. It shows adjusted gross income of $2,788.14, with a tax due of $441.16. The return shows net income from the grocery store operated by Julius during part of the year in the amount of $768.50 *176 and net rental income from a "Frame Apt. House-Indianola Ave." in the amount of $430.46, representing gross rental income of $1,960 and expenses and depreciation of $799.54 and $730, respectively. The $730 depreciation was computed on the basis of a $25,000 cost basis and a 20-year useful life. [1] Although Julius paid $25,000 for the Indianola property, $2,050 was allocable to the land. The 1953 return also reported the sale on January 10, 1953 of the frame apartment house property at 643 Hayes Avenue with a gross sale price of $17,000, cost of $14,600, depreciation allowed of $1,628.35 and expenses of sale of $850 resulting in $3,178.35 capital gains reported. In fact, the property was sold for $20,000, its cost was $12,813, allowed depreciation was $1,530.12, [2] and known expenses of the sale were $1,263.87, resulting in a capital gain of $7,453.25. In connection with the sale Julius hired an attorney. *177 On the escrow statement covering the sale, $482.23 of the $20,000 purchase price was charged to an item entitled "OPA-Judgment, Interest and Costs," and $10.10 was charged to an item entitled "Clerk of Courts, costs in case No. 137391." The 1953 return listed total receipts from the grocery business of $14,640 less cost of goods sold of $12,557, and less business expenses of $1,314.50, including depreciation of $450 claimed for the store building and $442.50 claimed for store fixtures. Depreciation on the building was computed on the basis of a $12,000 cost and a 20-year useful life, and depreciation on the fixtures was computed on the basis of a $2,950 cost and a 5-year useful life. [3] To the contrary, the store building was constructed at a cost of $10,500, the land having been purchased at a cost of $1,500. *178 The 1954 return of Julius was filed April 18, 1955. The return shows adjusted gross income of $2,538.65 with tax due of $380.26. It reports net income from the grocery store of $1,441.85, resulting from gross receipts of $27,295.85, cost of goods sold of $24,110.71 and expenses of $1,743.29, and it reports net rental income from the apartment house at 2707 Indianola Avenue of $1,096.80, resulting from gross rentals of $2,520, depreciation of $730 and other expenses of $693.20. No other rental income is reported on the return. The depreciation claimed on the return for the Indianola Avenue property, the grocery store, and the grocery store fixtures were the same amounts as were claimed in the 1953 return, i.e., $730, $450, [3] and $442.50, respectively. The 1955 tax return of Julius was filed April 16, 1956, and reflects adjusted gross income of $2,882.24 with tax *179 of $445.44. It reflects net income from the grocery store of $1,514.76 resulting from gross receipts of $28,330.46, cost of goods sold of $24,947.17, and expenses of $1,868.53 and it reflects net rental income from the apartment house at 2707 Indianola of $1,367.48, resulting from gross rentals of $2,880, depreciation of $840, including $110 depreciation for gas conversion units added to the property in 1955, and expenses of $672.52. The same amounts for depreciation are claimed for the year 1955 for the Indianola Avenue property without the gas conversion units, the grocery store, and the grocery store fixtures as were claimed in the years 1953 and 1954, i.e., $730, $450 and $442.50, respectively. The 1953, 1954 and 1955 tax returns of Julius were prepared by a third party upon the basis of oral information furnished him by Julius and without books or records. On July 15, 1957, an income tax return was filed for the Estate of Julius. It reflects adjusted gross income of $2,586.25, with tax of $388.49. It was prepared by W. R. Machuga, Attorney, and signed by Modestina Cercone, Administratrix. The return shows net receipts from the grocery business of $1,416.25, resulting from *180 gross receipts of $28,500, cost of goods sold of $24,995.75 and expenses of $2,088 and it reflects net rental income of $1,170 from the Indianola property resulting from gross rental income of $2,880, depreciation of $1,360, and expenses of $350. Depreciation for the Indianola Avenue property, the grocery store, and the grocery store fixtures was claimed in the respective amounts of $1,250, $600 and $590, based on the same cost basis and useful life for each of the assets as were claimed in the earlier years 1953, 1954, and 1955. No rental income from properties other than the Indianola apartments was reported. Machuga prepared this return primarily from the retained copy of Julius' 1955 return which was given to him by Modestina and after discussing the matter with Modestina. He attached a letter to the return as filed noting that there were not sufficient records of Julius' income and expenses available from which to make an accurate return and stated that if additional records appeared, a corrected return would be filed. No corrected return for 1956 for the Estate of Julius has ever been filed. During the first half of 1951 and during 1952, 1953 and 1954 Julius received a monthly *181 rental of between $45 and $65 for a two-story wood house located at 640 Erie Street (Lot No. 3379-Erie). Sometime during the period 1952 to 1954 Julius added a front porch to the 640 Erie Street house and also during this period the tenants had the interior of the house painted at their own expense. The tenants paid utilities for the property. Julius also received a rent of $40 a month, or a yearly total of $480, for the house at 642 Erie Street which was occupied by two bachelors during the years 1951 through 1954. Julius also received a monthly rental of $65 or a yearly total of $780 for the 821 East Florida Avenue property from April 1952 through the end of 1956. Julius did not report any receipts from the 640 or 642 Erie Street or 821 East Florida Avenue properties on any of his returns. During all of 1956, the tenant at 821 East Florida made the $65 monthly payments to Julius; after Julius' death in February 1957, the tenant made the $65 payments to Modestina and obtained signed receipts of such payments from Modestina. The tenant moved out of the property in 1958. At some time between 1952 and February 1957, Julius purchased for the property a second-hand water tank, a thermostat *182 for the furnace, and paint for the outside of the house. The tenant did considerable repairs to the property including, at some time during 1957 or 1958, painting the whole interior of the house, and installing a new top on the sink in the kitchen, a wall in the bathroom, a back to the sink in the kitchen, and new piping under the kitchen sink. The tenant paid all utilities for the property. Real estate taxes for 821 East Florida Avenue for the years 1953 to 1957, inclusive, were paid in the respective amounts of $75.50, $74.64, $37.75, $118.91 and $96.72, and interest on the mortgage on this property for the years 1952 to 1955, inclusive was paid in the respective amounts of $125.48, $125.33, $107.28, and $60.53. During the period from October 1955 to July 1957, gross rent of $3,076.69, consisting of $521.55, $1,579 and $976.14 for the respective years 1955, 1956 and 1957, was received by the real estate agent who handled the rental property at lots 2961, 2962 Ridge Avenue owned by Julius. No receipts from the Ridge Avenue properties were reported on any of Julius' tax returns. For this same period the real estate agent made disbursements as follows: DISBURSEMENTS
1/5/56
Insurance
$ 146.85
4/4/56
Labor-remove grape arbor
5.00
5/1/56
Payments to Julius Cercone
515.70
2/15/57
Insurance
177.87
6/19/57
Plumbing Expense
9.16
5/17/57
Insurance
25.17
7/31/57
Management Charges
307.67
1,189.42
Mortgage Payments
15 payments $100.00
1,500.00
BALANCE
2,689.42
INCOME
$3,076.69
Expenses
$2,689.42
Escrow Acct.
387.27
$3,076.69
$3,076.69
*183 No books or records of Julius were furnished to the agents who examined Julius' tax returns for the years 1951 through 1956. Modestina through her attorney made the representation that books and records were maintained by Julius but were taken in a burglary approximately 1 month after Julius' death. In the investigation of this burglary, Modestina represented to the police that two cigar boxes, one containing a number of United States Savings bonds and the other containing a number of old watches, jewelry, and personal papers, were missing. A box full of assorted wrist watches, lockets, bracelets and four bank books on the Union National Bank bearing Julius' name was subsequently recovered and returned by the police to Modestina. Julius was killed in a robbery of his grocery store on February 15, 1957. An individual was convicted of a crime arising from the occurrence and sent to the penitentiary. Earnings of Julius for the period of April 1, 1937 through September 30, 1950, as based upon reports to Social Security by the specified employer, are as follows: Amount
Period
Reported
Employer
1937 - 2nd Quarter
$ 71.50
American Bridge Co.
1937 - 2nd Quarter
503.64
Truscon Steel Co.
1938
1,608.07
Truscon Steel Co.
1939
1,719.30
Truscon Steel Co.
1940
1,788.52
Truscon Steel Co.
1941
2,684.89
Truscon Steel Co.
1942
3,000.00
Truscon Steel Co.
1943 - 1st, 2nd, 3rd Quarters
1,756.99
Truscon Steel Co.
1944 - 1st Quarter
315.54
MacKenzie Muffier Co., Inc.
1945 - 3rd Quarter
5.01
Commercial Shearing & Stamping Co.
1945 - 4th Quarter
0.33
Commercial Shearing & Stamping Co.
1945 - 4th Quarter
530.97
Carnegie Illinois Steel Corp.
1946 - 1st Quarter
236.68
Carnegie Illinois Steel Corp.
1946 - 2nd Quarter
165.73
Ohio Steel Work & Furnaces
1947 - 3rd Quarter
331.40
Charles L. Radcliff
1947 - 4th Quarter
289.50
Girard Tank Welding Co.
1947 - 4th Quarter
16.00
Herman Holmes
1947 - 4th Quarter
472.00
Blaw Knox Construction Co.
1948 - 2nd Quarter
531.85
United Engineering and Foundry
1948 - 3rd Quarter
982.80
United Engineering and Foundry
1948 - 4th Quarter
757.91
United Engineering and Foundry
1949 - 3,000.00
United Engineering and Foundry
1950 - 1st, 2nd, 3rd Quarters
1,457.84
United Engineering and Foundry
$22,226.47
*184 Income taxes were paid during the following years in the following amounts by Julius: Year
Amount
Year
Amount
1951
$ 42.35
1954
$341.16
1952
None
1955
584.26
1953
100.00
1956
479.44
Modestina gave Julius $2,200 in 1951, $4,250 in 1952, and loaned Julius $5,000 in 1953. The garage in which Julius conducted his electric welding and car repairing activities, in the rear of 700 Poland Avenue, was built by Modestina in 1950 for $8,000. The Probate Court in 1957 allowed a claim of Modestina Cercone for a $5,000 loan against the Estate of Julius Cercone. The Probate Court file for this estate was missing as of May 14, 1963, and could not be found by that Court. Julius filed income tax returns for the years 1939 to 1941, and 1944 to 1955, inclusive, showing no income tax liabilities for any years except 1941, 1944, 1946, 1948, 1949, 1950, 1953, 1954 and 1955 for which liabilities in the amounts of $63, $81.31, $22.77, $1.60, $150, $98.25, $441.16, $380.26 and $445.44, respectively were shown. Julius is entitled to a reserve for depreciation for his rental and business properties in the amounts and computed as follows: Date
Estimated
Property
Acquired
Life
Cost
12/31/50
12/31/51
Lot 3379 (Erie St.)
1/22/45
22
$2,387.00
$ 651.00
$ 759.50
Lot 3379 (Hayes Ave.)
1/22/45
22
5,513.00
1,503.54
1,754.13
Improvements
1/ 1/52
15
6,900.00
Lot 6861 (315 Glenwood
6/20/51
22
1,690.00
38.41
Ave.)
Lot 3815 (Poland Ave.)
8/28/51
22
1,885.00
28.56
Lot 52798 (Stocker
1/21/51
22
1,240.00
4.70
Ave.)
Lot 31979 (827 Florida
Ave.
including
12/26/51
33-1/3
5,180.00
improvements)
Lot 28219 (1012
6/ 2/52
22
2,825.00
Garland Ave.)
Lot 3633 (514 Gibson
4/ 1/53
22
10,500.00
St.)
Lot 23544 (2703
4/17/53
22
22,950.00
Idlewood St.)
Improvements
1/20/55
20
550.00
Lot 5855 (1249 Poland
2/15/55
22
1,415.00
Ave. No. 1)
(1249 Poland Ave. No.
2/15/55
22
1,625.00
2)
Lot 4376 (709 Franklin
9/ 3/55
22
2,315.00
Ave.)
Lot 2961 (559 Ridge
10/ 6/55
22
2,850.00
Ave.)
Lot 2962 (553-555
10/ 6/55
22
5,050.00
Ridge Ave.)
Lot 4260 (722
4/10/56
22
1,010.00
Arlington St.)
Ford tractor and
2/ 1/51
3
4,320.00
1,440.00
trailer
Store fixtures
4/ 1/53
10
2,950.00
Totals
$2,154.54
$4,025.30
*185 Property
12/31/52
12/31/53
12/31/54
12/31/55
12/31/56
Lot 3379 (Erie St.)
$ 868.00
$ 976.50
$1,085.00
$1,193.50
$ 1,302.00
Lot 3379 (Hayes Ave.)
2,004.72
Improvements
460.00
Lot 6861 (315 Glenwood
115.22
192.03
268.84
345.65
422.46
Ave.)
Lot 3815 (Poland Ave.)
114.24
199.92
285.60
371.28
456.96
Lot 52798 (Stocker
61.06
117.42
173.78
230.14
286.50
Ave.)
Lot 31979 (827 Florida
Ave.
including
155.40
310.80
466.20
621.60
777.00
improvements)
Lot 28219 (1012
74.90
203.30
331.70
460.10
588.50
Garland Ave.)
Lot 3633 (514 Gibson
357.95
835.22
1,312.49
1,789.76
St.)
Lot 23544 (2703
695.45
1,738.63
2,782.36
3,826.09
Idlewood St.)
Improvements
25.21
52.71
Lot 5855 (1249 Poland
58.95
123.26
Ave. No. 1)
(1249 Poland Ave. No.
67.78
141.74
2)
Lot 4376 (709 Franklin
35.07
140.27
Ave.)
Lot 2961 (559 Ridge
32.38
161.92
Ave.)
Lot 2962 (553-555
57.15
285.78
Ridge Ave.)
Lot 4260 (722
34.50
Arlington St.)
Ford tractor and
2,880.00
trailer
Store fixtures
221.25
516.25
811.25
1,106.25
Totals
$6,733.54
$3,274.62
$5,701.22
$8,404.92
$11,495.70
*186 Julius had assets, liabilities, and net worth for each year 1950 through 1956 as follows: 12/31/50
12/31/51
12/31/52
12/31/53
Cash on Hand
$ 100.00
$ 100.00
$ 100.00
$ 100.00
Cash in Banks
4,125.30
1.00
33.91
2,548.24
Real Estate
9,600.00
23,210.00
35,355.00
58,042.00
Account Receivable
6,921.59
Ford Tractor and
Trailer
4,320.00
4,320.00
Store Fixtures
2,950.00
2,000.00
Store Inventory
Total Assets
$20,746.89
$27,631.00
$39,808.91
$65,640.24
Liabilities
Account Payable
Golden Dawn Foods
608.32
McAllister Dairy
238.51
Home Savings & Loan
No. 17377
2,801.16
2,591.23
2,429.48
Dollar Savings & Trust
6,616.79
Modestina Cercone
5,000.00
McEvey Stevenson
Agent
Reserve for
depreciation
2,154.54
4,025.30
6,733.54
3,274.62
Total Liabilities
2,154.54
6,826.46
9,324.77
18,167.72
Net Worth
$18,592.35
$20,804.54
$30,484.14
$47,472.52
12/31/54
12/31/55
12/31/56
Cash on Hand
$ 100.00
$ 100.00
$ 2,850.00
Cash in Banks
11,824.59
11,208.52
14,116.22
Real Estate
61,367.00
76,642.00
76,052.00
Account Receivable
Ford Tractor and
Trailer
Store Fixtures
2,950.00
2,950.00
2,950.00
2,100.00
1,995.75
1,995.75
Store Inventory
Total Assets
$78,341.59
$92,896.27
$97,963.97
Liabilities
Account Payable
Golden Dawn Foods
608.32
608.32
608.32
McAllister Dairy
238.51
238.51
238.51
Home Savings & Loan
No. 17377
2,239.77
Dollar Savings & Trust
5,735.32
2,480.61
1,647.45
Modestina Cercone
5,000.00
5,000.00
5,000.00
McEvey Stevenson
Agent
6,900.00
6,089.62
Reserve for
depreciation
5,701.22
8,404.92
11,495.70
Total Liabilities
19,523.14
23,632.36
25,079.60
Net Worth
$58,818.45
$69,263.91
$72,884.37
*187 Julius had understatements of income for each of these years computed as follows: Understatement of Income - Julius Cercone.
12/31/50
12/31/51
12/31/52
12/31/53
NET WORTH
$18,592.35
$20,804.54
$30,484.14
$47,472.52
Less: Net Worth
prior year
18,592.35
20,804.54
30,484.14
Change in net worth
2,212.19
9,679.60
16,988.38
Adjustments for: Cost of living
1,200.00
1,200.00
1,200.00
Income taxes paid
42.35
100.00
TOTAL
3,454.54
10,879.60
18,288.38
Less Adjustments For: Gifts from Modestina
2,200.00
4,250.00
Nontaxable portion of
long-term capital
gain
3,963.92
Adjusted gross income
1,254.54
6,629.60
14,324.46
Less income per return
2,788.14
Understatement of
income
1,254.54
6,629.60
11,536.32
Understatement of Income - Julius Cercone.
12/31/54
12/31/55
12/31/56
NET WORTH
$58,818.45
$69,263.91
$72,884.37
Less: Net Worth
prior year
47,472.52
58,818.45
69,263.91
Change in net worth
11,345.93
10,445.46
3,520.46
Adjustments for: Cost of living
1,200.00
1,200.00
1,200.00
Income taxes paid
341.16
584.26
479.44
TOTAL
12,887.09
12,229.72
5,199.90
Less Adjustments For: Gifts from Modestina
Nontaxable portion of
long-term capital
gain
205.00
Adjusted gross income
12,887.09
12,229.72
4,994.90
Less income per return
2,538.65
2,882.24
2,586.25
Understatement of
income
10,348.44
9,347.48
2,408.65
*188 Consents under section 275(c) of the Internal Revenue Code of 1939 fixing the period of limitation upon assessment of income tax (Form 872) were executed by the Estate of Julius Cercone, Deceased, Modestina Cercone, Administratrix, and the district director of internal revenue, Cleveland, Ohio, for the taxable years and on the dates, as follows: Taxable Year
Date or Dates Form
872 Executed
1952
March 14, 1958
February 11, 1959
March 10, 1960
1953
February 11, 1959
March 10, 1960
1954
March 14, 1958
February 11, 1959
March 10, 1960
1955
February 11, 1959
March 10, 1960
1956
March 10, 1960
Modestina Cercone was born in the town of Pacentro, Italy, in 1892. Her father was a bricklayer or artisan. While in Italy, Modestina attended school for 1 year and learned to read Italian. She married when she was 16 years old. Her husband, Ralph Cercone, came to the United States sometime before 1925. In about 1925 Ralph Cercone brought Modestina and their two children, Julius and Mario, to the United States. Modestina has lived in Youngstown, Ohio, since about 1936. Her husband Ralph who was a shoemaker resided in California from about 1935 until *189 his death in 1952. One son Julius resided with Modestina until his death in 1957 and one daughter Betty, born in the United States, resided with her until the daughter's marriage in 1946. Modestina has never filed a United States income tax return as to her income except an estimate filed in 1958. Modestina owned the land and building on Lot No. 2552 (700 Poland Avenue), purchased at a cost of $3,700. Modestina added additional rooms to the building subsequent to 1943 and prior to 1948 at an estimated cost of $4,000. She added a cement block garage to the same property during 1950 at an estimated cost of $8,000. Modestina and Julius lived at this address and on these premises Modestina operated a bar or tavern during 1955 through 1957 and a store or confectionery in 1954. Previous to 1954 and dating back to approximately 1943 when she first acquired the property, Modestina had operated either a store or bar of some type on the property. The agent who examined the income tax returns of Modestina Cercone for the years 1954 through 1957 was never furnished any books or records reflecting any of Modestina's business transactions, income, or disbursements. The records of Mahoning *190 County, Ohio, reflect that no real estate was owned by Modestina prior to 1943. Real estate purchased after 1942 owned by Modestina includes the following: Location
Date Purchased
Cost
Land
Building
Lot No. 2552 (Poland)
12/ 1/43
$ 740.00
$2,960.00
Lot No. 19126 (Cypress)
3/13/44
95.00
905.00
Lot No. 19510 (Alpine)
10/14/44
146.00
1,054.00
Lot No. 19511 (Alpine)
10/30/44
93.00
907.00
Lot No. 3472 (Prospect)
5/24/46
93.00
407.00
Lot No. 3470 (Prospect)
5/24/46
351.00
1,659.00
Lot No. 12760 (Himrod)
2/24/54
1,390.00
Lot No. 3424 (Himrod)
2/24/54
1,390.00
3,720.00
Part of Lot No. 11131 and part of
Lot 11136, (Wilson Ave.)
9/ 9/54
407.00
1,404.00
Part of Lot No. 11131
(Rigby Street)
9/ 9/54
76.00
1,113.00
Lot No. 12158 (Evergreen)
10/29/54
1,923.00
6,777.00
Lot No. 31183 (Gibson)
10/ 3/55
540.00
2,960.00
Lot No. 9858 (Franklin)
8/16/56
483.00
3,017.00
Lots Nos. 4354 and 4355 (Kyle)
8/30/56
357.00
2,518.00
All the properties listed above except lot 2552, Poland Avenue and lot 12158, Evergreen were owned by Modestina according to the deed records of Mahoning County from their respective dates of *191 purchase there shown through December 31, 1957. The property lot 2552, Poland Avenue, was owned by Modestina from December 1, 1943, to December 23, 1957 and was sold by Modestina during 1957 to the City of Youngstown by deed dated December 23, 1957, for $18,000. The taxable gain on the sale was $3,936.29, resulting from a cost basis of $15,700 and allowable depreciation of $1,636.29. Title to lot 12158, Evergreen, was transferred by Modestina to her daughter Betty in 1957 without consideration. The Evergreen property was purchased by Modestina on October 29, 1954. The property included land with a building thereon, the land having a cost basis of $1,923 and the building having a cost basis of $6,777. The purchase price included a note payable and mortgage in the amount of $2,500 to the seller, executed by Modestina and paid off on March 4, 1955. Modestina purchased the property with funds furnished by her daughter Betty. Lot 19510, Alpine, was purchased by Modestina through a land contract dated July 31, 1936, final payment on which was made during 1944 and deed then issued on October 14, 1944, to Modestina for this property. During 1957, Modestina inherited all of the real *192 estate owned by Julius at the date of his death. On December 31, 1957, Modestina owned real estate inherited from Julius during 1957 with a total basis to her of $133,200 which is the total value of such property as of the date of Julius' death, according to probate records. The properties inherited are as follows: Basis 12/31/57
Location
Land
Building
Lot 2551 (Poland)
$3,000.00
Lot 3379 Hayes (Erie)
782.00
$ 6,218.00
Lot 31190 (Wolf St.)
1,300.00
Lot 6861 (Glenwood)
1,458.00
3,042.00
Lot 3815 (Poland)
722.00
2,778.00
Lot 52798 (Stocker)
500.00
2,100.00
Lot 31979 (Florida)
1,170.00
5,830.00
Lot 52777 (Stocker)
400.00
Lot 28219, Garland
(Gayland)
894.00
3,606.00
Lot 3633 (Gibson)
1,625.00
11,375.00
Lot 23544 (Indianola)
$2,406.00
$27,594.00
Lot 4375 (Franklin)
700.00
Lot 5855 (Poland)
825.00
5,175.00
Lot 4376 (Franklin)
444.00
5,556.00
Lot 2961 (Ridge)
1,077.00
2,923.00
Lot 2962 (Ridge)
1,205.00
5,795.00
Lot 4260 (Arlington)
1,142.00
1,558.00
Lot 732 (Blaine)
1,176.00
28,824.00
$20,826.00
$112,374.00
The Probate Court of Mahoning County, Ohio allowed the claim filed in the Estate of Julius Cercone, *193 Deceased for funeral expenses in the amount of $2,604.52 which amount was paid to Fortunato Funeral Home in 1957. Additional expenses were incurred in connection with the disinterment of Julius Cercone and with the reburial of Julius during 1957 by Modestina Cercone which amounted to $2,850 paid to Calvary Cemetery in 1957 by Modestina Cercone; no claim for the additional amount of $2,850 has been presented to or allowed by the Probate Court in the Estate of Julius Cercone, Deceased. Modestina Cercone understands figures and simple arithmetic, and she understands spoken English. Rental income on lot 732 (Blaine Avenue) for 1957 amounted to $4,460, and the net rental profit after applicable expenses but before depreciation on the property was $2,309.38. During 1957 the Blaine Avenue property was handled by a real estate agent who collected the rents and paid expenses. The agent did not remit any amount of income to Modestina in 1957 but did make payments on a mortgage which was on the property. During Julius' lifetime a real estate agent received the rental payments and paid expenses for the Ridge Avenue property. Following Julius' death the agent continued to collect the rents *194 and, at Modestina's direction, had the payments applied against the mortgage on the property. In about July 1957, Modestina's son Mario took over the management of the Ridge Avenue property. Modestina entered into a land contract with Kenly and Idella Graham on December 16, 1953, for the sale of the south part of Lot 3472-Prospect, 25 feet width fronting on Prospect and 160 feet in length. This contract provided for a purchase price of $5,000, with $850 down and the balance with 6 percent interest on the unpaid balance to be paid at the rate of $55 per month. Modestina entered into a land contract with Robert and Catherine Smith on December 16, 1953, for the sale of Lot 3470-Prospect. This contract provided for a purchase price of $7,500 with $1,500 down and the balance with 6 percent interest on the unpaid balance to be paid at the rate of $65 per month. Modestina entered into a land contract with John and Mildred Wesleymoore and Louise Jackson on October 29, 1953, for the sale of the north part of Lot 3472-Prospect, 25 feet width fronting on Prospect and 160 feet in length. This contract provided for a purchase price of $4,000 with $900 down and the balance with 6 percent interest *195 on the unpaid balance to be paid at the rate of $45 per month. Payments on the three above mentioned land contracts were still being made in 1963. Although in 1953 the Ohio law made no provision for the recording of land contracts, each of these three land contracts was recorded among the lease records of Mahoning County, Ohio. Modestina received during 1954, 1955, 1956 and 1957 from land contracts with Kenly and Idella Graham, and with John and Mildred Wesleymoore and Louise Jackson interest income of $435, $390, $340 and $290, respectively, and long-term capital gains of $765, $810, $860, and $910, respectively. She received during the same years from a land contract with Robert and Catherine Smith interest income of $360, $335, $310 and $280, respectively, and long-term capital gains for the years 1955, 1956 and 1957 of $335, $470 and $500, respectively. Modestina received rental income from George Figuly during 1957 and from Frank Hudick during 1955, 1956, and 1957 in the amount of $20 a month for each individual. Modestina furnished Hudick with food during the years 1955 through 1957 and Hudick gave her money for so doing. She received additional rental income during 1957 *196 from known tenants which were deposited in particular savings accounts. The total rent deposits plus credits for interest earned on these accounts during 1957 was $1,795.35. Modestina as Administratrix signed and filed a sworn inventory and appraisements on April 18, 1957, for the estate of her son Julius in the probate proceeding listing the real property inherited by her from Julius. This document contained a waiver of notice of hearing on inventory signed by William R. Machuga as attorney for Fiduciary as well as by Modestina. On October 2, 1957, as administratrix, she signed and filed a sworn Schedule of Debts owed by the estate in the probate proceeding. The schedule showed debts in the amounts and dates allowed as follows: Name and Address of Claimant
Amount Claimed
Date Allowed
Mary McEvey Stevenson, Agent
$ 5,993.09
5/16/57
Mortgage on
21 E. Dewey Ave.
Lot No. 2962
Youngstown, Ohio
Metropolitan Savings & Loan
12,100.00
3/ 7/57
Mortgage on
Co., Youngstown, Ohio
Outlet No. 732
Dollar Savings & Trust Co.,
1,661.17
5/ 7/57
Mortgage on
Youngstown, Ohio
Lot No. 23544
Golden Dawn Foods
608.32
3/ 6/57
Sharon, Pennsylvania
McAllister Dairy
238.51
4/ 1/57
Warren, Ohio
Fortunato Funeral Home
2,604.52
3/11/57
Youngstown, Ohio
Modestina Cercone
5,000.00
9/13/57
(Approved by
700 Poland Ave.
Probate Court)
Youngstown, Ohio
United States Internal
Revenue Service
Unliquidated
claim for prior
income taxes.
Mahoning County Treasurer
2,090.98
((Re) Estate Taxes)
*197 Anthony Pacella, an attorney consulted by Modestina, prepared an income tax return for Modestina for the year 1957 after he was contacted in the tax investigation of Julius. He obtained information from Modestina, mostly estimates as to rent, expenses and real estate taxes for various properties she owned and rented out. He obtained rent income figures from real estate agents who were handling the Ridge and Blaine Avenue properties, and he obtained income figures on the Indianola property from a bank which maintained a special account wherein the Indianola tenants deposited their rent. He discussed each property with Modestina and ascertained its condition and whether it was occupied. He discussed these matters with her in Italian, and she understood him. He spent 5 afternoons with Modestina in preparing the return and then handed Modestina the return, told her she owed the taxes and told her to file the return. Modestina did not file that return or any return for the year 1957. Gross rental income reported on the proposed 1957 return was as follows: East Florida
$ 650.00
Idlewood (Indianola)
2,440.00
Ridge Ave.
1,400.14
Glenwood
500.00
Erie
540.00
Blaine Apts.
4,459.50
709 Franklin
480.00
Arlington
600.00
Garland
650.00
Stocker
210.00
Himrod
600.00
Rigby
600.00
Gibson
680.00
Franklin
274.00
Kyle
$ 204.00
Cypress
390.00
612 Alpine
350.00
Cement Block Garage
600.00
(Poland Avenue)
Storeroom. (512 Gibson)
675.00
712 Poland
240.00
642 Poland
314.43
1249 Poland
420.00
$17,277.07
*198 Julius helped his mother Modestina with financial matters and in taking care of her property. A friend of Modestina's, Carolyn Augell, was a public accountant in the business of preparing income tax returns for others. The internal revenue agent who investigated the tax liability of Julius and subsequently of Modestina told Modestina during the course of his investigation of Julius' liabilities that she was required to file returns. Modestina is entitled to reserve for depreciation for her rental properties in the amounts and for the years as follows: Estimated
Cost
Useful
or
Description of Property
Acquired
Life
Basis
12/31/53
Lot 2552 (700 Poland Ave)
12/ 1/43
22
$ 4,000.00
$1,090.86
Lot 19126 (Cypress St.)
3/13/44
22
905.00
400.00
Lot 3472 (39 Prospect St.)
5/24/46
25
407.00
122.10
Lot 3470 (35 Prospect St.)
5/24/46
25
1,659.00
497.70
Lot 3424 (806 Himrod Ave.)
2/22/54
25
3,720.00
Lot 11131 (Wilson Ave.)
9/ 9/54
20
1,404.00
Lot 11136 (1031 Rigby St.)
9/ 9/54
20
1,113.00
Lot 31183 (Gibson St.)
10/ 3/55
22
2,960.00
Lot 9858 (801 Franklin Ave.)
8/16/56
22
3,017.00
Lots 4354 & 4355 (239-239-1/2
Kyle St.)
8/30/56
22
2,518.00
Lot 19510 (Alpine St.)
10/14/44
25
1,054.00
Lot 19511 (Alpine St.)
10/30/44
25
907.00
Lot 3379 (Erie St.)
2/17/57
20
6,218.00
Lot 6861 (315 Glenwood Ave.)
2/17/57
18
3,042.00
Lot 3815 (Poland Ave.)
2/17/57
18
2,778.00
Lot 52777 (Stocker Ave.)
2/17/57
18
2,100.00
Lot 31979 (827 Florida Ave.)
2/17/57
28
5,830.00
Lot 28219 (1012 Garland Ave.)
2/17/57
20
3,606.00
Lot 3633 (514 Gibson St.)
2/17/57
20
11,375.00
Lot 23544 (2703 Idlewood St.)
2/17/57
20
27,594.00
Lot 5855 (1249 Poland Ave.)
2/17/57
18
5,175.00
Lot 4376 (709 & 709-1/2 Franklin
Ave.)
2/17/57
20
5,556.00
Lot 2961 (559 Ridge Ave.)
2/17/57
18
2,923.00
Lot 2962 (553 & 555 Ridge Ave.)
2/17/57
18
5,795.00
Lot 4260 (722 Arlington St.)
2/17/57
18
1,558.00
Lot 732 (Blaine Ave.)
2/17/57
20
28,824.00
$2,110.66
*199 Description of Property
12/31/54
12/31/55
12/31/56
12/31/57
Lot 2552 (700 Poland Ave)
$1,272.67
$1,454.48
$1,636.29
$
Lot 19126 (Cypress St.)
441.13
482.26
5,123.39
864.52
Lot 3472 (39 Prospect St.)
138.38
154.66
170.94
187.22
Lot 3470 (35 Prospect St.)
564.06
630.42
696.78
763.14
Lot 3424 (806 Himrod Ave.)
124.00
262.80
411.60
560.40
Lot 11131 (Wilson Ave.)
23.40
93.60
163.80
234.00
Lot 11136 (1031 Rigby St.)
18.55
74.20
129.85
185.50
Lot 31183 (Gibson St.)
33.63
168.17
302.71
Lot 9858 (801 Franklin Ave.)
45.71
182.84
Lots 4354 & 4355 (239-239-1/2
Kyle St.)
38.15
152.60
Lot 19510 (Alpine St.)
42.16
84.32
126.48
168.64
Lot 19511 (Alpine St.)
36.28
72.56
108.84
145.12
Lot 3379 (Erie St.)
259.09
Lot 6861 (315 Glenwood Ave.)
140.84
Lot 3815 (Poland Ave.)
128.61
Lot 52777 (Stocker Ave.)
147.22
Lot 31979 (827 Florida Ave.)
173.51
Lot 28219 (1012 Garland Ave.)
150.25
Lot 3633 (514 Gibson St.)
473.96
Lot 23544 (2703 Idlewood St.)
1,149.75
Lot 5855 (1249 Poland Ave.)
239.59
Lot 4376 (709 & 709-1/2 Franklin
Ave.)
231.50
Lot 2961 (559 Ridge Ave.)
135.32
Lot 2962 (553 & 555 Ridge Ave.)
268.29
Lot 4260 (722 Arlington St.)
72.13
Lot 732 (Blaine Ave.)
1,201.00
$2,660.63
$3,342.93
$4,230.00
$8,227.75
*200 Modestina had assets, liabilities, net worth, increase in net worth, and unreported income for each year as follows: 12/31/53
12/31/54
12/31/55
12/31/56
12/31/57
Assets
$
$
$
$
$
Cash on hand
3,250.00
3,250.00
3,250.00
3,250.00
3,250.00
Cash in Banks
4.06
1,608.14
5,307.40
23,662.22
Real Estate
21,410.00
39,610.00
43,110.00
49,485.00
158,285.00
Account with Real
Estate
Agent (Rubenstein)
2,309.38
Loan Receivable
(Julius
Cercone)
5,000.00
5,000.00
5,000.00
5,000.00
5,000.00
TOTAL ASSETS
29,660.00
47,864.06
52,968.14
63,042.40
192,506.60
Liabilities
Mortgage (Lois
2,500.00
McClain)
Reserve for
2,110.66
2,660.63
3,342.93
4,230.00
8,227.75
depreciation
Total Liabilities
2,110.66
5,160.63
3,342.93
4,230.00
8,227.75
Net Worth
27,549.34
42,703.43
49,625.21
58,812.40
184,278.85
Prior year net worth
27,549.34
42,703.43
49,625.21
58,812.40
Increase in net worth
15,154.09
6,921.78
9,187.19
125,466.45
Adjustments for: Living Expenses
2,000.00
2,000.00
2,000.00
3,600.00
Burial expenses paid
by
Modestina
2,850.00
Gift of Evergreen to
Betty
8,700.00
Total
17,154.09
8,921.78
11,187.19
140,616.45
Less Adjustments for: Gifts from Betty
6,200.00
2,500.00
Nontaxable portion of
capital gains on Lot
2552
(Poland)
1,968.14
Recovery of cost basis
on
Robert and Catherine
Smith contract
420.00
90.00
Nontaxable capital
gains of
payments on land
382.00
582.00
665.00
705.00
contracts
Nontaxable receipt
133,200.00
from estate of Julius
Cercone
Total downward
7,002.00
3,172.00
665.00
135,873.14
adjustment
Understatement of
10,152.09
5,749.78
10,522.19
4,743.31
income
*201 Respondent in his notice of deficiency determined the deficiencies in tax of the Estate of Julius Cercone for each of the years 1951 through 1956 and of Modestina Cercone for each of the years 1954 through 1957 upon the basis of taxable income computed by increase in net worth during each such taxable year with adjustments for personal and other nondeductible amounts and in the case of Modestina Cercone for inheritances with the explanation in each instance that taxable net income was so computed "in the absence of adequate records." Respondent determined additions to tax for fraud in each year in which a deficiency was determined both for the Estate of Julius Cercone and for Modestina Cercone. Respondent also determined the additions to tax under sections 294(b)(2), 294(b)(1)(a) and 294(d)(1)A of the Internal Revenue Code of 1939 and section 6654 of the Internal Revenue Code of 1954 as heretofore set forth. Ultimate Facts There is a deficiency in income tax due from the Estate of Julius Cercone for each of the years 1952 and 1953 and a part of such deficiency in each such year is due to fraud with intent to evade tax. There was an underpayment of income *202 tax by Julius Cercone for each of the years 1954 and 1955 and a part of such underpayment is due to fraud with intent to evade tax. There is an underpayment of income tax by the Estate of Julius Cercone for the taxable year 1956 but respondent has failed to prove by clear and convincing evidence that any part of such underpayment is due to fraud with intent to evade tax. Julius Cercone filed false and fraudulent income tax returns for each of the years 1952 and 1953 with intent to evade tax. Respondent has failed to establish by clear and convincing evidence that Julius Cercone filed a false and fraudulent income tax return for the year 1951 with intent to evade tax. The assessment and collection of any deficiency from the estate of Julius Cercone for the year 1951 is barred by the Statute of Limitations. The estate of Julius Cercone is subject to additions to tax under the provisions of section 294(d)(2) of the Internal Revenue Code of 1939 for each of the years 1952 and 1953. The estate of Julius Cercone is subject to an addition to tax under the provisions of section 294(d)(1)(A) of the Internal Revenue Code of 1939 for the year 1954. No part of the underpayment of *203 income tax by Modestina Cercone for any one of the years 1954, 1955, 1956, and 1957 is due to fraud with intent to evade tax. Modestina Cercone is subject to an addition to tax under the provisions of section 294(d)(1)(A) of the Internal Revenue Code of 1939 for the year 1954. Modestina Cercone is subject to additions to tax under the provisions of section 6654 of the Internal Revenue Code of 1954 for each of the years 1955, 1956, and 1957. Opinion The two basic issues in these cases are whether there are deficiencies in each petitioner's income tax for the years in issue, and if so, whether any portions of such deficiencies or underpayments are due to fraud. In the case of the estate of Julius Cercone, there is also the issue of whether Julius filed false and fraudulent income tax returns for the years 1951, 1952, and 1953, and if not, whether there was omitted from his returns for 1952 and 1953 over 25 percent of his gross income. Petitioner has the burden of proving error in respondent's determinations of deficiencies, but respondent has the burden of proof as to the omission of over 25 percent of gross income and respondent must prove fraud by *204 clear and convincing evidence. Respondent computed each petitioner's income for each year by the net worth plus expenditures method. No books and records for either Julius or Modestina were offered or made available to respondent. Consequently, respondent's use of the net worth plus expenditures method in computing understatements of income for petitioners is justified. We have set forth in our findings net worth computations of each petitioner which show that Julius reported less than his correct taxable income in each year here in issue and that Modestina, who filed no income tax returns, had taxable income in each year in issue. In determining the taxable income of each petitioner for each year we have considered the various items of the net worth of each petitioner as determined by respondent with which petitioners disagree. There is no disagreement between the parties as to many items. The primary contention of each petitioner is that respondent has allowed insufficient depreciation on his or her rental properties and has not allowed for cash on hand and gifts. The depreciation adjustment for which each petitioner contends is sufficient to eliminate approximately one-half *205 of the deficiencies determined by respondent, and the claims of cash on hand, gifts, and accrued expenses would eliminate the balance as to the estate of Julius, and cash on hand, gifts, and a claimed reduction in cost of living for Modestina would eliminate the balance of the income for her shown by respondent's net worth statement. Respondent determined economically useful lives for most of the real estate held by Julius and that held by Modestina, of 33 1/3 years for the periods here in issue. Petitioners contend that these properties have useful lives generally varying from 8 years to 20 years. We have made findings of the economically useful lives for each of the business properties owned by Julius and of each of those owned by Modestina, both at the date of acquisition and, as to the properties Modestina inherited from Julius, as of February 17, 1957. In reaching our conclusion as to the useful life of each property, we have considered all the evidence including the useful life shown by Julius on the return be filed for the properties reported thereon, the useful lives of the properties shown on a return prepared by a lawyer for Modestina for the year 1957 after discussion *206 with her, which return she did not file, and the testimony of petitioners' expert witnesses. One of petitioners' expert witnesses gave his opinion as to the useful lives of the properties at the date of their acquisition and the other his opinion of the useful lives of these properties as of the date of his inspection thereof in April 1963 but in some instances the life expectancies given by this expert from 1963 were approximately the same as those given by petitioners' other expert witness from the acquisition date. We have considered the testimony of these witnesses as to the type of neighborhood in which these properties were located, the prospects of the properties being condemned because of public uses of the land in the neighborhood and the type and condition of the properties. Each petitioner contends that for certain properties depreciation on the 150 percent declining balance method is proper. The 150 percent declining balance method, however, was neither elected by either petitioner in a first return filed in which depreciation was sustained, nor has respondent granted permission for petitioners to use the declining balance method of computing depreciation, one of which *207 is required under respondent's ruling in order for a taxpayer to be entitled to use the 150 percent declining balance method. See Revenue Ruling 57-352, 1957-2 C.B. 150. However, we need not discuss the validity of respondent's ruling since the testimony of petitioners' expert witnesses is to the effect that the declining balance method of computing depreciation would be inappropriate. One of the witnesses stated that the neighborhoods in which the properties were located were deteriorating at a constant rate and the other expert stated that the neighborhoods were deteriorating at an increasing rate. Both statements are inconsistent with the use of the declining balance method of computing depreciation. Modestina has claimed depreciation on the $8,000 cement block garage addition to her property at 700 Poland Avenue. The evidence is that Julius, until the time of his death, operated a welding and car repair business in the garage, although petitioners tend to diminish the importance of this business. However, there is no showing that any income arising from the garage accrued to Modestina's benefit. The evidence shows that Modestina did not hold the garage as an income *208 producing asset but merely allowed Julius to use the garage in his business enterprise rent free. Depreciation has been allowed for 1957 because in that year Modestina received rental income from the garage. We have allowed depreciation on the 700 Poland Avenue property for the $4,000 addition made to the property subsequent to purchase. Modestina and Julius lived at this address and Modestina operated a confectionery store and later a bar on the premises. The $4,000 is the portion of the cost of this property which we consider applicable to its business use. Petitioners contend that respondent failed to take into consideration amounts which Julius owed at the end of the net worth period. Petitioners state that in order to properly reflect his net worth, expenses that are owing but unpaid, such as real estate taxes, accounts payable, payroll, electric, and the like should be deducted as liabilities from Julius' assets in determining his net worth. Julius was a cash basis taxpayer, and therefore, must report income and expenses for tax purposes when they are actually received or paid. He may not deduct accrued but unpaid operating expenses any more than he need include accrued but *209 unpaid income. When income is computed on the net worth plus expenditures method, this distinction between the cash and accrual method of accounting should be maintained. Therefore, in a net worth computation for a cash basis taxpayer, accrued but unpaid items of income are not includable assets and accrued but unpaid operating expenses are not includable liabilities. However, if a liability is related to an asset appearing on the net worth computation, such liability should be known. Scanlon v. United States, 223 F. 2d 382 (C.A. 1, 1955). We have made an adjustment to Julius' net worth computation by including therein as liabilities two items totaling $846.83 which we have concluded are applicable to assets which we have included in the net worth computation. These two items appear on a schedule of debts filed for Julius' estate and were allowed during the Probate proceedings. The two claimants or creditors are Golden Dawn Foods, Sharon, Pennsylvania and McAllister Dairy, Warren, Ohio. Although there is no precise evidence on the point, it is clear that these liabilities relate to the grocery business carried on by Julius at 512 Gibson Street. We have concluded that *210 these liabilities represent purchases of inventory merchandise by Julius for his store. Our net worth computation includes the store inventory as an asset in Julius' net worth, and it is only consistent that these liabilities incurred to create this asset should be reflected in the net worth statement as liabilities. The record does not show when these liabilities were incurred by Julius, but they were outstanding at the time of his death. We have concluded that Julius bought on credit and consistently had liabilities against his inventory of approximately this amount since his inventories were relatively constant in amount. Therefore, we have included in Julius' net worth computation liabilities of $846.83 for each of the years 1953 through 1956, during which period Julius operated the store. It is contended on behalf of the Estate of Julius that much of the increase in Julius' net worth was due to his receipt of nontaxable gifts before and during the net worth period made by various individuals. It is asserted that Julius had $2,000 cash on hand (as opposed to cash in the bank) on December 31, 1950, the result of a gift made to him by an individual named George Figuly. Figuly testified *211 he sold a house located in Carnegie, Pennsylvania in 1949 for $2,300, and that he turned $2,000 of this money over to Julius in 1950. Respondent determined that Julius had no cash on hand as of December 31, 1950. Respondent based his zero determination on a computation showing that Julius' expenditures equalled his income prior to December 31, 1950, thus eliminating the possibility of Julius' having any accumulated funds at that time. Respondent's computation omits reference to any amount being received by Julius from Figuly. Respondent also put in evidence the bank records of a savings account belonging to Figuly. These records reflect no sizeable deposits made in 1949 when Figuly testified that he sold the Carnegie property, and this fact, respondent asserts, shows that Figuly did not receive the $2,300 during that period. Most of Figuly's testimony was confusing and some of it unintelligible. The evidence is insufficient to enable us to make a finding of fact either that Figuly did nor did not give Julius $2,000 in 1950. We have therefore not included the $2,000 in Julius' net worth statement and will further discuss the bearing of this contention of petitioner on our conclusion *212 on the fraud issues. Petitioners also contend that Figuly gave Julius $480 annually for the years 1951 through 1953. Figuly testified that he gave Julius monthly amounts in excess of the $20 onthly rental that he was paying Julius. The purpose of these transfers was not made clear. Figuly also testified that when he was hospitalized for 18 months in 1955, with tuberculosis, Julius paid for all his expenses. On the testimony offered we have been unable to determine what amounts Figuly gave Julius or whether they were gifts or merely amounts Julius was to safekeep for Figuly. Consequently, we have not made any adjustment in Julius' net worth for these alleged transfers to Julius from Figuly. Petitioners assert that Julius received $11,450 in gifts from his mother Modestina during the net worth period which amounts were used by Julius to purchase various properties. Modestina also testified to this effect. We have found as a fact that $11,450 was transferred to Julius by Modestina during Julius' net worth period, $6,450 as gifts and $5,000 as a loan. Modestina maintained she made gifts of $11,450 to Julius even at a time when her statements were to her financial detriment. The making *213 of the gifts was asserted in a protest filed on behalf of the Estate of Julius with respondent on October 25, 1958, which was approximately 10 months prior to the issuance of a 30-day letter to Modestina but at a time when such action by respondent was anticipated by Modestina. Also, there is evidence that Modestina, prior to 1950, had a large amount of cash hidden in the building where she lived. A friend of Modestina's, Carolyn Augell, testified that in 1946 she saw Modestina count up $20,000 in cash of all denominations which Modestina kept in a bag hidden in a wall at her residence on Poland Avenue. While this witnesses testimony that the amount of cash was $20,000 is subject to question since she was not actually involved in the counting of the money, there is collateral support for the existence of such cash in excess of $5,000. Carolyn Augell stated that Julius lent her now deceased brother $5,000 to start into the trucking business which amount was to be returned when her brother received a Reconstruction Finance Corporation loan. The witness testified that the loan was repaid during the following year. The witness was the bookkeeper of her brother's business and produced an *214 executed agreement with respect to obtaining a loan from the Reconstruction Finance Corporation dated in February 1946 which supported her testimony as to the time when she saw the cash. The fact that the $5,000 loan was an arrangement made by Julius also supports either some joint ownership of the funds by Julius or Modestina's willingness to let Julius use her money. Also in 1950 Modestina spent $8,000 adding a cement block garage to her Poland Avenue property which she allowed Julius to use rent free for his welding and repair business. While we do not accept Modestina's testimony as to the source of the cash she had available in 1946, we are convinced that she had a substantial amount of cash hidden in her living quarters at that time. We have concluded that of the $11,450 Modestina transferred to Julius during 1951 through 1953, $6,450 was in the form of gifts and $5,000 was in the form of loans. Petitioners contend the whole $11,450 represents gifts and that a $5,000 claim made by Modestina and allowed by the Probate Court against Julius' estate relates to a loan transaction separate from the aforementioned transfers totalling $11,450. The evidence, however, does not bear out *215 this contention. We have found that the $5,000 loan was made by Modestina to Julius in 1953. Modestina testified that the $5,000 loan to Julius came from the sale proceeds of the Prospect Street property which was sold in 1953. Apparently, according to Modestina, the sale proceeds were put in a bank account or in two accounts in separate banks, the account or accounts being in the names of Julius and Modestina, and that Julius used the money to purchase the Blaine Avenue property in 1957. The evidence shows that Julius and Modestina had no joint accounts at the time of the purchase of the Blaine Avenue property. Testimony that Julius used the money in 1957 to purchase the Blaine Avenue property is inconsistent with the making of the loan in 1953 without any showing as to where the funds were held until 1957. It is more likely that the $5,000 loan related to two transfers Modestina admittedly made to Julius in 1953, enabling Julius to build his store and purchase store inventory, which transfers totaled $5,000. It is also claimed that Julius received $11,000 from a relative, Uncle Amadeo, in 1954. Edmund Cercone, a cousin of Julius, testified he was present in either late 1953 or *216 early 1954 at the home of Julius and Modestina when Amadeo handed Julius $11,000 cash in bills of various large denominations. Edmund stated the transaction occurred in a backroom of the building at 700 Poland Avenue. Modestina testified that she was also present during this transaction. The testimony of Edmund was that he first saw Amadeo in 1950 and that the time the counting of the money occurred was the first and only time either he or Julius saw Amadeo. Edmund also testified that Modestina was not present when Amadeo gave Julius the money. We have not found that Amadeo gave Julius $11,000 in 1953 since we do not consider any testimony as to this gift to be reliable. Edmund's testimony was to the effect that Julius wanted money to go into a real estate venture, that Julius approached Edmund's father for a loan, and that Edmund's father recommended that Julius approach Amadeo. Edmund stated that Julius first met Amadeo at the meeting when Amadeo handed the $11,000 to Julius. Amadeo lived in Denver, Colorado, and had operated a shoe repair shop in Denver. He was married but his wife had died prior to June 1, 1954, the date of Amadeo's death. Amadeo had a brother also living in *217 Denver. It is not only incrediblee that Amadeo would make such a large transfer of money to Julius, a virtual stranger, but also incredible that Amadeo possessed this amount of money. Amadeo received oldage pension payments from the state of Colorado from November 1950, until his death in June 1954. In a pension application dated April 21, 1950, Amadeo listed ownership of assets totaling only $2,064.12, including the home in which he lived. This application was rejected because upon investigation the authorities discovered he had cash or its equivalent of a little over $1,000. A similar application filed in October 1950 was made and no cash assets discovered so that the application was granted. There is in evidence a letter dated August 15, 1954 written by one of Modestina's relatives to Modestina stating that Amadeo had $11,000, all in $1,000 bills which Amadeo had kept at home in cash in order not to lose his old-age pension but after Amadeo's death his relatives could not find the money although they made a thorough search of Amadeo's home. The letter is hearsay with respect to the facts therein recited. The writer of the letter did not testify and the letter does not show the *218 basis of her assumption that Amadeo had $11,000 he was concealing from the Colorado State authorities. Certainly if in fact Amadeo had left $11,000 with Julius for Julius to invest for him in real estate, which was the purpose of the transfer according to each witness who testified to such transfer, Julius should have promptly returned the money to the legal representatives of Amadeo's estate upon receipt of the letter since he had at the date of the letter invested only $275 in real estate since the middle of 1953 and did not make any further real estate investments until July 30, 1955. Since Julius is unavailable to explain any transaction he might have had with his Uncle Amadeo, we are unwilling to assume that he embezzled his Uncle's fund and have therefore assumed that if in fact Amadeo gave any funds to Julius in early 1954 to invest for him in real estate, Julius returned such funds to Amadeo's executor or administrator after Amadeo's death and before the end of 1954 so that the receipt and return would cancel each other and the transaction would have no effect on the net worth computation of Julius for the year 1954. From Edmund's statement that he first saw Amadeo in 1950 *219 and that he saw the money given to Julius the first time he ever saw Amadeo the inference is that if Amadeo did give Julius any money in order to hide it from the pension authorities of Colorado, it was a much less amount than $11,000 and was given to Julius in 1950, a year not in issue here. It is contended that Julius received $475 from a Frank Hudick in 1955. Hudick testified he gave Julius $475 but did not state the year in which he made the gift. According to Hudick's testimony he has been closely associated with the Cercones since 1946. We have omitted the $475 from Julius' net worth statement because we are not able to determine whether such a gift was made and if there was such a transfer whether it was made during the years here in issue and if so, in which year. Petitioners claim that Julius is entitled to a $1,000 reduction in the gain resulting from his sale of real estate in 1953. The $1,000 amount represents a real estate agent's commission on the sale. Respondent allowed $850 as expenses of this sale but apparently was unaware of the $1,000 commission. The record does not show what items comprised the $850 amount allowed by respondent. On brief respondent has allowed *220 expenses of sale of $1,263.85, which includes the $1,000 amount. There is in evidence an escrow statement covering the expenses of the subject sale which lists expenses of $1,263.87, plus additional expenses of $492.33 which relate to a lawsuit not related to the sale. These latter expenses may not be attributed to the sale of the property. Petitioners have offered no proof showing that the $1,000 commission should be added to the $850, originally allowed by respondent in computing the expenses of the sale. There was testimony that Julius hired an attorney in conjunction with the sale. However, neither the function the attorney played nor the amount paid to him is shown. Respondent included in Julius' net worth for December 31, 1956, the amount of $3,843.19, as cash on hand. This amount represents the difference between the $29,500 [4] price paid by Julius for the Blaine Avenue property, purchased February 13, 1957, and $25,656.81 which represents the total of the mortgage given on the property and cash withdrawals from Julius' known bank accounts. There is no direct evidence that Julius had $3,843.19 as cash on hand on December 31, 1956. Respondent concluded that he did have such *221 cash on hand on December 31, 1956, from the fact that there is no other source apparent for this amount of the purchase price put up for the Blaine Avenue property in February 1957. We have concluded Julius had $2,850 as cash on hand on December 31, 1956, and that the balance of $993.19 represents income received by Julius in 1957 prior to the date of the property purchase. To sustain his determination for additions to tax for fraud, respondent must prove by clear and convincing evidence that a portion of the deficiency or underpayment in Julius' income tax for each year was due to fraud. M. Rea Gano, 19 B.T.A. 518 (1930). Julius filed returns for the years 1951 through 1955, and Modestina filed a return for the Estate of Julius for 1956. Julius never listed receipts from more than one of his rental properties on the returns he filed for 1951 through 1955, although throughout the period he owned six apartment units, five single houses and one double house, and owned other rental properties during part of this period. Receipts from only one such property *222 were listed on the return filed for his estate by Modestina. The net worth plus expenditures computation for Julius set forth in our findings reveals income substantially in excess of the amounts reported on the returns for all years except 1951. The record shows that Julius was born in Italy, and was brought to this country at approximately age 8 years. He was a welder by trade and served in the Army during World War II. He bought, sold, and owned a considerable amount of real estate. He also carried on a trucking business and an auto repair and welding business. Julius was handy at making repairs to his rental property. He apparently had no difficulty conversing in the English language. Without precisely so stating, each witness who had known Julius well gave the impression that Julius was an intelligent and shrewd businessman. Carolyn Augell who is a public accountant and prepared tax returns for others, made several references to Julius that gave the impression that Julius understood general business relationships. She referred to a loan to help her brother go into the trucking business and Julius' consideration of going into such a business with her brother. She also referred *223 to asking Julius to let her make out his income tax returns and Julius' reply that he could get that done free at the Internal Revenue Service. Other of the witnesses including Modestina stated in effect that they consulted Julius about their financial problems or ventures. We have concluded that Julius filed false and fraudulent income tax returns for each of the years 1952, 1953, 1954, and 1955 with intent to evade tax and that a part of the deficiencies or underpayments in each such year is due to fraud with intent to evade tax. Repeated and substantial understatements of income evidence a fraudulent intent. Holland v. United States, 348 U.S. 121 (1954) and Bryan v. Commissioner, 209 F. 2d 822 (C.A. 5, 1954), certiorari denied 348 U.S. 912, affirming a Memorandum Opinion of this Court. Julius deliberately omitted listing receipts from certain of his rental properties on his returns. Petitioners contend that Julius did not make any net income after expenses on his properties other than the properties, the receipts from which he reported. The increase in Julius' net worth suggests that rentals of these other properties were profitable. On *224 his 1951 and 1952 income tax returns Julius reported losses in each year of over $1,000 on his trucking business which he offset against rental income. This shows that Julius understood that his reported income was offset by business losses and the inference is clear that Julius would have taken advantage of any losses from his rental business. The understatements for each of the years 1952 through 1955 are well in excess of the amount of taxable income which Julius would have had if he had been entitled to the greater depreciation deductions which are claimed for him on brief. We have found no fraud for the year 1951. The net worth computation set out in our findings shows an understatement of only $1,254.54. This increase could be explained if Julius had $2,000 cash on hand as of December 31, 1950, and if he spent the $2,000 on assets appearing in his net worth statement for December 31, 1951. There is evidence that Julius might have been given $2,000 during 1950 by George Figuly, an amount representing part of the proceeds from the sale of a house owned by Figuly. This evidence constitutes a relevant lead to a nontaxable source of income which the respondent could have run down. *225 The record shows that Figuly represented to respondent's agent during the course of the investigation that he had given part of the proceeds of the sale of a house in Carnegie, Pennsylvania to Julius. Cf. Holland v. United States, supra. We hold respondent did not satisfactorily run down this lead. Presumably records could have been consulted to determine whether or not Figuly did, in fact, own a house in Carnegie, Pennsylvania, and whether or not he sold the house in 1949 for $2,300, as he testified. Therefore, for purposes of the fraud issue we have concluded respondent has failed to establish that Figuly did not give Julius $2,000 in 1950. Having concluded that respondent has failed to show that Julius did not have $2,000 cash on hand as of December 31, 1950, it follows that the evidence fails to show that when Julius purchased real estate in excess of his other cash funds in 1951, such purchases were not made with this $2,000 of cash. In the absence of proof of fraud by respondent, the statute of limitations bars the assessment or collection of any deficiency for the year 1951. Since Modestina filed the 1956 income tax return for Julius' Estate, a portion of the deficiency *226 of Julius' estate for the year 1956 is due to fraud if Modestina's action as administratrix in filing such return was false and fraudulent with intent to evade tax. Modestina, in her capacity as administratrix, was acting as agent for Julius' estate and the fraud of an agent, acting in the capacity of agent, will be imputed to the principal. Cf. Irving S. Federbush, 34 T.C. 740 (1960), affirmed per curiam 325 F. 2d 1 (C.A. 2, 1963) and the cases cited therein on page 749. The 1956 return which Modestina filed for Julius' estate reported receipts from only the properties, receipts from which had been reported on Julius' 1955 income tax return. Modestina, at the trial, claimed a lack of understanding of income tax and other business affairs. The 1956 return for Julius' estate was made out by the lawyer who was representing Modestina as administratrix of Julius' estate. This lawyer had signed the waiver of notice of hearing on inventory filed in the Probate proceeding of Julius' estate on April 18, 1957, which was prior to the date that the return for Julius' estate was prepared and filed, an extension of time for filing such return having been obtained. Therefore, *227 the lawyer who prepared the return for Julius' estate for Modestina must have known of Julius' other properties but there is no evidence in the record to show that he in any way informed Modestina that the receipts from rentals of these properties should be included in the gross income shown on the return. The inference from the record is that because of Modestina's emotionally disturbed condition as a result of the shock of her son's untimely death, he did not discuss the items in the return with her to any appreciable extent. From observing Modestina as a witness and considering all her statements, we concluded that she attempts to give the impression of far less understanding than she actually has. From time to time in her testimony her true ability to understand would be reflected but she quickly became aware of the situation and resumed her role of lack of understanding. While the lack of reliability of much of Modestina's testimony at the trial plus the fact that she knew of the properties owned by Julius at the date of his death and of at least some of the rents being received arouse the suspicion that she might have known that the return she filed for Julius' estate for 1956 *228 understated Julius' income, this is not the clear and convincing evidence required of respondent to prove fraud when considered in conjunction with the fact that Modestina relied upon an attorney who also knew of the property owned by Julius to prepare the return for her. The 1956 return filed for Julius' estate was based on Julius' 1955 return. There is no clear or convincing evidence in the record that Modestina knew that Julius' 1955 return was false and fraudulent or even that it did not reflect his true income. We hold that respondent has failed to establish that any part of the deficiency in tax of the estate of Julius for the year 1956 was due to fraud. Respondent determined deficiencies and additions to tax for fraud against Modestina using the net worth plus expenditures method. In addition to Modestina's contention that respondent in his computation of her net worth, did not allow her sufficient depreciation, she also claims that respondent failed to credit her with cash on hand and land contracts receivable held at the start of the net worth period and improperly included in her net worth computation two properties, Himrod and Evergreen, which were owned by her daughter *229 Betty. We have already discussed the depreciation issue respecting Modestina's rental properties. Modestina claims respondent failed to credit her with cash on hand at the start of the net worth period of $23,250. This sum is composed of $20,000 which she claims was a cash hoard held over the years and $3,250 which was the total amount received by her as down payments on three land contracts entered into by her at the end of the year 1953. Modestina testified she brought $18,000 to $20,000 to the United States from Italy about 1925. She stated she subsequently received gifts from her husband and received other amounts on the sale of property owned by her family in Italy. We find Modestina's testimony that she brought a large amount of cash in United States currency from Italy when she came to this country in 1925 inherently incredible. We also do not believe that she received any amount of money as distinguished from the Italian bond which is in evidence from her family in Italy. We do believe that by 1946 she had accumulated from undisclosed sources a substantial amount of cash. It is possible that some of this cash was an accumulation of the amounts Betty gave to Modestina when *230 Betty was unmarried and living with Modestina. Also, the record does not account for any business or occupation in which Modestina might have herself engaged from 1925 until 1943 when she began operating the store or bar on Poland Avenue. Modestina was extremely frugal and over a period of 18 years might well have hoarded a substantial amount of cash even with a rather meager income. It is also, of course, possible that her husband did send her some funds a part of which she was able to save. We have concluded that although Modestina may have had a large amount of money eached away in 1946, she spent it prior to December 31, 1953. Modestina contends, and we have accepted the fact that she transferred $11,450 to Julius during the years 1951 through 1953. The record also shows that Modestina spent $8,000 erecting a cement block garage in 1950 and spent $4,000 making improvements on the Poland Avenue property at some time during the years 1944 through 1947. These expenditures would deplete the $20,000 cash hoard to which Carolyn Augell testified even if in 1946 the cash she had was in this amount. For the purpose of contesting the deficiencies determined by respondent, it is incumbent *231 upon Modestina to show how her depleted cash hoard was replenished by 1953. This she has failed to do for she has insisted that in 1953 she still had the cash she brought from Italy without accounting for the source of her gifts to Julius and her other large expenditures. Except for the $3,250 which Modestina contends she had on hand on December 31, 1953, from down payments on three land contracts she had entered into late in 1953, we have concluded that she had failed to establish that she had any cash on hand on December 31, 1953. The evidence shows that Modestina received $3,250 in cash from two land contract sales late in 1953 and we have accepted as true her testimony that she had this cash on hand on December 31, 1953. On brief, Modestina contends that she retained the $3,250 as cash on hand throughout the net worth period and there is nothing in the record to show to the contrary. Consequently, the existence of this cash on hand will have no effect on the computation of understatement of income for any of the years here in issue. Modestina claims her opening net worth of December 31, 1953, should contain an asset representing amounts receivable on four land contracts then *232 outstanding. The amount she claims should be treated as an asset is stated variously at $17,364.39 and $13,598.50. The $17,364.39 figure represents the total amounts due on four land contracts in existence as of Decembef 31, 1953, and the $13,598.50 represents the total amount due less Modestina's total cost basis for the properties. In computing her change in net worth for each of the succeeding years, Modestina reduces the initial amount of the contracts receivable by payments made during the current year which are chargeable to the principal amounts due under the contracts. Respondent made no special provision for the existence of these land contracts. Respondent determined, and petitioner agrees, that the land contracts had no ascertainable fair market value on December 31, 1953, and he thus included the properties subject to the land contracts in his net worth computation for each year at their cost basis to Modestina. Neither respondent's nor petitioner's treatment of the amounts received from the land contract sales is entirely correct. By including the properties subject to the land contracts in the net worth computation for each year at Modestina's cost, the payments received *233 on the contracts made during the years here in issue will appear as income on the net worth computation in the year the payment is received to the extent that such amounts take form in increased assets. If the money were cached away but not included as cash in the net worth statement, this is merely an error in such statement as prepared by respondent which petitioner has failed to show. Petitioner's method of including the total unpaid balance on the contracts as an asset in opening net worth and by reducing this asset as payments on the contracts are made has the effect, under a net worth plus expenditures computation, of making the entire gain on the land contracts appear in the opening year of the computation, 1953. However, the parties agree the land contracts had no ascertainable value on December 31, 1953, and that the gain on the land contracts is taxable only as the payments which exceed cost basis are received. Harold W. Johnston, 14 T.C. 560 (1950). We have made adjustments to respondent's computation respecting the land contracts to reflect the fact of the time the cost basis on each of these properties was recovered since the basis of one of the properties *234 was not recouped by Modestina until 1954, to treat the payments as partly interest and partly payments on the unpaid principal balances, and to treat the gains on these sales as capital gains. The parties are agreed as to the amounts of the payments made during the years here involved and there is no indication that the payments do not appear as assets in Modestina's net worth. Modestina contends that the Evergreen and Himrod properties should be excluded from her net worth statement since they actually belonged to her daughter Betty who, according to Modestina, supplied the funds used to purchase these properties. We have found as a fact that Betty did furnish the funds to purchase the Evergreen property and have thus excluded the Evergreen property from Modestina's net worth. Betty testified that she provided the funds to pay both the $6,200 cash payment and the $2,500 mortgage for the Evergreen property, that the reason the property was placed in Modestina's name was the existence of discord between Betty and her husband and that the title to the property was transferred to Betty in 1957 because of concern that Betty might not receive the property in the event of Modestina's death. *235 It is noted that the transfer of title to Betty occurred within 6 months after Julius' death. Modestina testified that when the Himrod property, where Betty was living, proved unsatisfactory as a home, Betty gave Modestina money and Modestina then purchased the Evergreen property. Betty and her family have since occupied the Evergreen property and Betty has paid all real estate taxes thereon. Betty's payment for the property is confirmed by $2,000 in bank withdrawals made by Betty at the time of purchase and by a $3,000 receipt given Betty as the deposit made by her on the purchase of the Evergreen property. The transfer of title to the Evergreen property to Betty in 1957 was without consideration. We have found as a fact that Betty was not the equitable owner of the Himrod property. Neither Betty nor Modestina clearly stated that Betty provided Modestina with funds for the express purpose of enabling Modestina to purchase the Himrod property. Their testimony is that before Betty was married in 1946 and when she was working and living at home with Modestina, Betty gave money to Modestina. This was 8 years before the Himrod property was purchased, and the extent of these payments *236 by Betty is not shown. The payments have more of the nature of a family living arrangement than of an obligation which would affect Modestina's net worth computation. Modestina has never transferred title to the Himrod property to Betty. We also note that on Modestina's proposed 1957 income tax return she reported rental income and claimed deductions for repairs and taxes for the Himrod property. In his net worth computation respondent has charged Modestina with a cost of living of $3,600 per year. Petitioner contends $1,800 is a more nearly correct amount. The evidence shows Modestina lived frugally. She lived rent free in her own apartment building. Her apartment was furnished simply and inexpensively. She made her own dresses. She did not operate an automobile. We have concluded that during each of the years 1954, 1955 and 1956 she spent $2,000 a year as living expenses for herself. There are indications in the record that Modestina was ill during the year 1957 subsequent to Julius' death and that her son Mario and his wife and children came and lived with her for most of that year. The record does not show the family living arrangement. If Modestina were paying all the living *237 expenses, certainly the $3,600 of living expenses determined by respondent for the year 1957 is a minimum amount. Since petitioner has the burden of showing error in respondent's computation and has failed to do so as to the 1957 living expenses, we hold that Modestina's living expenses for the year 1957 were $3,600. Modestina claims she is entitled to a $2,500 credit for each of the years 1954 through 1957 for gifts made to her by Frank Hudick. The evidence shows that Hudick retired from his job in 1955, and before that he earned $50 a week. Modestina testified Hudick gave her various unspecified amounts of money and that she supplied him with food and gave him spending money, $15 or $20 a month, when he needed it. On the evidence we are unable to determine the amount of the transfers to Modestina and whether such transfers, if any, in excess of the cost of his food and the amounts returned to him by Modestina, were gifts to Modestina, a profit from food furnished to him, or merely to be held by her for safekeeping for Hudick. Consequently, we have made no adjustment for these possible transfers. A final adjustment which we have made is to show as an asset the $2,309 of profit *238 before depreciation on the Blaine Avenue apartments which were managed by Modestina's agent. This amount was used in part to defray the principal amount of a mortgage indebtedness on the property which mortgage indebtedness had been allowed as a debt of Julius' estate and the balance was held by the agent for Modestina's account. The mortgage is not shown as a liability of Modestina's on the net worth statement and therefore its reduction does not show as an increase in net worth. We have allowed an addition to the reserve for depreciation for this apartment to Modestina for 10 months of the year 1957. Respondent has determined additions to tax for fraud against Modestina. The net worth computation does show sizeable amounts of unreported income for each of the years here in issue. However, much of this increase arises not because of proven items but because of petitioner's failure to prove error in respondent's determination. Respondent has shown some omissions of specific items of income consisting of rent payments and gain on the sale of various pieces of real estate. The actual omissions of rental receipts are minor for all years prior to 1957. Modestina professed not to understand *239 that gains on the sale of real estate represented income. Modestina and her lawyer prepared a return for the year 1957 which showed adjusted gross income of $5,312.32. Modestina's lawyer told her to file this return. She did not do so and explained her failure to do so by the fact of lack of understanding and that she did not actually get the money from the rents. This explanation is plausible considering that $4,460 of the reported rental receipts were from Blaine Avenue and were not turned over to Modestina during the year. In fact respondent overlooked adjusting for this item in his net worth computation. Most of the other rentals were paid by the tenants into building and loan accounts which Modestina did not draw out during the year. Modestina never filed an income tax return for herself although she filed a 1956 income tax return for Julius' estate. However, she had little if anything to do with the preparation of that return. Because we believe from the evidence that Modestina had more knowledge of business and of the necessity of filing Federal income tax returns than she professed to have, we consider her failure to file grossly negligent. However, her failure to file returns *240 does not cause her underpayment of tax to be due to fraud unless respondent shows by clear and convincing evidence that Modestina knew she had taxable net income and was attempting to evade tax thereon. This showing respondent has not made. If Modestina, in fact, had cash on hand as of December 31, 1953 of $20,000 in addition to the amount we have held she has established that she had, most of these increases in her net worth over the years here involved would be accounted for, the balance being primarily due to allowing her less depreciation reserve than she claims. While Modestina has not proven that she did have such cash on hand, there is no convincing evidence that she did not. There is no showing of the amounts of money that petitioner's husband might have sent her from California from 1935 until his death. The record contains no showing of his income. The record shows that Modestina's husband died in December 1952 leaving an estate valued at not in excess of $10,000 consisting primarily of four residence lots and five houses in the city of Delano, California. This, however, does not show what his earnings were and what he might have sent Modestina through the years. Modestina *241 was a very frugal person and could save much of very little. There is reference in the record in the testimony of respondent's own agent of visits to Modestina by her family from California and to Mario and his family coming from California to live with Modestina for the balance of 1957 after Julius died. This is some indication that Modestina's husband and children in Caliornia may have sent her money. Except for the showing that Modestina never filed Federal income tax returns, there is no showing of her own income for years prior to 1953. During the years prior to 1940, a person of Modestina's frugal nature may have saved a substantial portion of income too small to require the filing of a Federal tax return. We have sustained respondent's determination of deficiencies to a large extent because of petitioner's failure of proof. However, this is not sufficient basis for holding that respondent has shown fraud by clear and convincing evidence. Even gross negligence, in failing to file Federal income tax returns does not per se show fraud. We have concluded that respondent has failed to show by clear and convincing evidence that any part of the underpayment in Modestina's income *242 tax for any one of the years 1954, 1955, 1956 and 1957 was due to fraud with intent to evade tax. Our decision on the fraud issue as to Julius' estate makes it unnecessary for us to discuss respondent's alternative argument that Julius omitted over 25 percent of his gross income from his returns for 1952 and 1953. Petitioners have not contested the additions to tax under sections 294(d)(1)(A) and 294(d)(2) of the Internal Revenue Code of 1939 or section 6654 of the Internal Revenue Code of 1954 other than to assert that no tax is due. The amounts of such additions for the years 1952 through 1956 for the Estate of Julius and for 1954 through 1957 for Modestina may be computed under Rule 50. Since there are no deficiencies due from the Estate of Julius for 1951, because of the bar of the Statute of Limitations, there are no additions to tax under these sections for this year. Decisions will be entered under Rule 50. Footnotes
1. The record does not explain why only $730 was deducted for depreciation when, according to the cost basis and useful life claimed on the property, Julius would be entitled to a depreciation deduction of $1,250 a year or $833 for the 8-month period he owned the apartment in 1953.↩
2. Under the depreciation issue we have decided the allowable depreciation for 643 Hayes Avenue was $2,004.72, thus resulting in a capital gain on the sale of $7,927.85.↩
3. The record does not show why the above amounts were claimed as depreciation deductions for the store and the fixtures when, according to the cost basis and useful life claimed for each of the two assets, Julius was entitled to depreciation deductions of $600 and $590 for the store and the fixtures, respectively.↩
3. The record does not show why the above amounts were claimed as depreciation deductions for the store and the fixtures when, according to the cost basis and useful life claimed for each of the two assets, Julius was entitled to depreciation deductions of $600 and $590 for the store and the fixtures, respectively.↩
4. The parties have stipulated the purchase price for the Blaine Avenue property variously at $29,500 and $30,000.↩